RECEIVED

17 OCT 24 PH 1:42

CLERK U.S. DIST. COURT
WEST. DIST. OF MO
KANSAS CITY MO.

GWENDOLYN, a/k/a GWEN CARANCHINI,  )
1203 West 62nd Street               )
Kansas City, Missouri 64113         )
                                    )
            Plaintiff,              )
                                    )
Vs.                                 ) CASE NO. 4:17cv-000667-DPR
                                    )
LOLA PECK and RICK PECK, collectively; )
And LOLA PECK and RICK PECK,        )
individually;[1]                    )
        32640 WEST 2O7th Street     )
        Edgerton, Kansas 66021      )
                                    )
            And                     )
                                    )

---

[1]     Since the filing of the initial Complaint the Office of the District Attorney has dismissed in its entirety the Municipal charge it filed against Caranchini in January of 2017 and the attached Order has been entered by the Johnson County District Court. **SEE EX. 1 (Expungement remains pending as well as return of the bond)** This Court will note it specifically provides that Caranchini may have "contact" with the Pecks with regard to legal matters thereby modifying the "No Contact Order". The "No Contact" Order, which accompanied the filing of the Municipal charge, will be dissolved, January 23, 2018 in its entirety. This First Amended Complaint was prepared to be filed in the United States District Court for the Western District of Missouri Western Division the week of October 23, 2017. Before formal service was made, it was provided informally to the Pecks and the Johnson County Attorney to see if formal service could be avoided and an agreed upon date for "reply" could be arrived at by all parties. Unfortunately, neither the Pecks, jointly or individually, nor any of the Johnson County Defendants agreed to such "informal service" which is often done in Missouri. Consequently, formal service will be made after the First Amended Complaint is formally filed in the United States District Court for the Western District of Missouri Western Division at the commencement of the week beginning October 23, 2017. A "Notice" will be provided the Court with addresses, telephone numbers and emails for its information to contact the parties. The filing is made within the 90 day time period and there are five additional individuals added since originally filed August 11.

1

THE COUNTY OF JOHNSON, STATE OF )
KANSAS, including its JAIL and workforce )
On February 9 and 10, 2017 located in )
Olathe, Kansas; )
 )
      And )
 )
THE OFFICE OF THE DISTRICT ATTORNEY, )
and more particularly, )
STEPHEN HOWE, the District Attorney, )
JOHN FRITZ, AND MICHAEL McELHINNEY, )
 Assistant District Attorneys, )
 )
      And )
 )
THE HONORABLE DAN VOKINS )
     Johnson County District Court Judge)
     Johnson County, Kansas )
 )
      And )
 )
THE HONORABLE JAMES E. PHELAN )
     Johnson County District Court Judge)
     Johnson County, Kansas )
 )
        Defendants. )


### GWEN G. CARANCHINI'S

### FIRST AMENDED COMPLAINT UNDER MISSOURI/KANSAS
### STATE LAW AS APPLICABLE AND FEDERAL LAW

### AGAINST

LOLA PECK, RICK PECK, (JOINTLY AND SEVERALLY); THE COUNTY OF JOHNSON, STATE OF
KANSAS, INCLUDING THE JOHNSON COUNTY "JAIL" FACILITY" IN OLATHE, KANSAS; THE
DISTRICT ATTORNEYS' OFFICE, and more specifically, STEPHEN HOWE, JOHN FRITZ, and
MICHAEL McElHINNEY; AND THE FOLLOWING JUDGES OF THE COURTS OF JOHNSON
COUNTY, KANSAS: THE HONORABLE JUDGE DAN VOKINS AND JUDGE JAMES E. PHELAN

2

Comes now Gwen G. Caranchini, hereinafter referred to as "Caranchini", Plaintiff herein, and makes the following claims against Rick and Lola Peck, collectively, hereinafter referred to as the "Pecks"; against Lola Peck individually, hereinafter referred to as LPeck; against Johnson County, Kansas, hereinafter referred to as JOCO; against the Johnson County Jail facility located in downtown Olathe, Kansas, hereinafter referred to as "the Jail", (if this is an independent entity from Johnson County); against The District Attorney Stephen Howe, hereinafter referred to as Howe, against the Assistant District Attorney, Michael McElhinney, hereinafter referred to as McElhinney, against the Assistant District Attorney John Fritz, hereinafter referred to as Fritz; against the Honorable Dan Vokins, hereinafter referred to as Judge Vokins; and The Honorable Judge James E. Phelan, hereinafter referred to as Judge Phelan, and collectively referred to as "the Judges".

## DIRECTORY TO PORTIONS OF LAWSUIT

Pages

Directory to Brief……………………………………………………………………………………….. 3

Parties to Lawsuit……….. ……………………………………………………………………………. 5

Jurisdiction Statement………………………………………………………………………………… 10

Venue Statement…………………………………………………………………………………………… 26

Attempts to Settle/Mediate to Date…… …………………………………………………………….. 27

Statement of Facts Regarding Claims against Defendants………………………………….. 31

    Rick Peck and Lola Peck whether individually or collectively………… 31-50

        The Jail……………………………………………………………………………………… 51

        Post Jail …………………………………………………………………………………… 59

Hiring Bell and Court Appointed Lawyer……………………………………….. 61

Actions and Inactions by DA's…………………………………………………….. 66

Caranchini's Damages……………………………………………………….….. 68

Claims Against Parties…………………………………………………………..……………

A. Against Pecks:

1) Count I against Pecks Jointly……………………………………………… 71

2) Count II against Pecks Jointly…………………………………………….. 76

3) Count III against LPeck individually………………………………………… 79

4) Count IV against LPeck individually………………………………………… 83

B. Count V against JOCO……………………………………………………………… 85

C. Count VI against District Attorney Howe and Assistant District

Attorneys Fritz and McElhinney…………………………………………… 97

D. Count VII against Judges Vokins and Phelan…………………………………… 101

E. Injunctive Relief
Sought Against Pecks collectively………………………………………….. 104
Sought Against Johnson County…………………………………………….. 106

Request for Trial by Jury………………………………………………………………….. 117
Exhibits to Brief………………………………………………………………………..

1. Email from "RPeck" to Caranchini actually written and sent by LPeck      48
2. Order from the District Court of Kansas Dismissing Municipal Charge
   Against Caranchini      87
3. Temporary Restraining Order Served on Caranchini      71
4. Municipal Charge which Caranchini was not served with but which she was
   handcuffed and "jailed" upon`      71
5. Letter from RPeck but written by LPeck dated Jan 18, 2017      87
6. Letter purportedly written by RPeck and purported notarial on
   letter of October 18, 2018.      105

**PARTIES TO THE LAWSUIT**

1.  Gwendolyn (Gwen) Gill Caranchini, hereinafter referred to as "Caranchini", is the sole plaintiff in this lawsuit; she is a resident of Kansas City, Jackson County, Missouri and at all times referenced in this lawsuit was a resident of Kansas City, Missouri. She was 68 years of age at the time of the filing of the lawsuit, but since that time has had a birthday and is now 69; she is a widow since 2003 from her husband of 32 years and from her fiancé Hugh in 2006. She is currently a single woman who represents federal government employees against government agencies for whistle blowing lawsuits in administrative agencies and also federal government employees who have discrimination lawsuits before the EEOC. She was admitted to practice law in 1978 in Missouri and subsequently the federal courts in Missouri and Kansas, the appellate courts in the Eighth, Ninth and Tenth Circuit Courts of Appeals and the United States Supreme Court and occasionally with local counsel pursued cases in the State of Kansas; she was disbarred originally in 1997 in Missouri and then other jurisdictions but retains the right to represent individuals before the MSPB and EEOC as an attorney.

2.  Lola Peck, hereinafter referred to as LPeck, is an individual resident of Johnson County, Kansas at all times relevant hereto; she was married to RPeck at the time Caranchini met RPeck, but RPeck informed Caranchini almost immediately upon Caranchini and RPeck's initial meeting that their Minister after two years of "counseling" had declared their marriage "null and void" for LPeck's failure to engage in marital relations with RPeck for almost two years. She filed for divorce from RPeck in August of 2016 allegedly because of RPeck's relationship with Caranchini according to RPeck; that divorce was finalized December 14, 2016 according to RPeck. It is unknown whether she is currently again married to RPeck as RPeck said he would never "marry" anyone after his divorce from LPeck; but

5

RPeck and LPeck were wearing "wedding rings" that "matched" when Caranchini saw them at the first setting of the Temporary Restraining Order.[2] LPeck is divorced from her first husband with whom she had two children, one of which, Caranchini believes, is a Johnson County Sheriff based upon conversations with RPeck.

3. Rick Peck, hereinafter referred to as RPeck, is believed to be an individual resident of Johnson County, Kansas although it is unknown whether he currently resides with LPeck in the house in which she lives as he gave up all interest in that home according to RPeck when the divorce was finalized December 14, 2016 and was supposed to move out by December 31 at 11:45 p.m.; it is unknown whether he is currently married to LPeck as he informed Caranchini on or about December 14, 2016 that he was never getting married again and he was moving temporarily into Caranchini's home while he searched for a home as he had been unable to find some place he could afford despite Caranchini trying to find something for him. RPeck and LPeck wear matching "wedding rings" but again it is unknown whether they are "actually" married. RPeck is divorced from his first wife

---

[2] Caranchini believes, based upon her relationship with RPeck and statements by him to her over the years, that LPeck may have "forced him" to remarry her after the divorce and that the marriage was not "voluntary" and is therefore null and void although RPeck may not admit it because LPeck will threaten him if he so states based upon a pattern of behavior that he has engaged in over the years with her and which has become clearer to Caranchini over time; he also appears to be very "codependent" upon her. This has been stated to Caranchini by someone who has known the Pecks prior to Caranchini knowing the Pecks and who Caranchini came to know through meeting the Pecks and with whom she has spoken recently. He may also believe he "needed" to marry LPeck to protect Caranchini from LPeck's threats against her.

with whom he had one child, and he never had children with his second wife, LPeck
or with any other woman according to RPeck.

4. The "JAIL" was, and to the best of Caranchini's knowledge currently is, owned and
operated by Johnson County, Kansas. The facility in which Caranchini was
incarcerated on February 9, 2017 at the end of the hearing on the Temporary
Restraining Order, was directly across the street from the Johnson County
Courthouse and Caranchini was handcuffed and brought to that jail in handcuffs at
the conclusion of the hearing on the TRO having no idea why she was brought to the
jail as she was not informed at the time of her handcuffing why she was being
handcuffed nor read her rights. It is not known whether "the Jail", is a separate
"entity" apart from "Johnson County", Kansas, owned and operated by a third party,
or merely operated by a third party and such will need to be determined, and if
owned by a "third party" such "third party", whether the "owner", or "operator" or
"owner and operator" will need to be added as an additional party defendant.

5. Johnson County, Kansas, hereinafter referred to as "JOCO", is a "county" entity
within the State of Kansas; its primary "headquarters" is in Olathe, Kansas at 111
Cherry Street, Olathe, Kansas; it is believed that the "Jail" in which Caranchini was
wrongfully incarcerated is "owned" and "operated" by JOCO (see Paragraph 4
above) or subject to rules put in place by JOCO. If, as set forth in Paragraph 4
hereinabove, the Jail is not "owned" and/or "operated" by Johnson County, this
paragraph will need to be amended; additionally, it is not known whether Johnson
County is responsible for the actions of its "Judges" named herein below or whether

7

another entity oversees said Judges; in the event Johnson County is not responsible

for the actions of its "Judges" and another "entity" is responsible for their actions,

that entity shall be added to this litigation; likewise, it is not known whether

Johnson County is responsible for the actions of its "District Attorney and Assistant

District Attorneys" as named herein; in the event Johnson County is not responsible

for their actions and they report to another entity; that entity may be added to this

litigation;

6.  The Honorable Daniel W. Vokins, hereinafter referred to as Judge Vokins, is a

    Magistrate Judge in the Johnson County District Court and is located in the Johnson

    County District Courthouse at 111 Cherry Street, Olathe, Kansas; he is the "Judge"

    who entered the "bail" for Caranchini while she was incarcerated but who also failed

    to have Caranchini appear before him to advise her of what she was charged and

    never did advise Caranchini of the charges; rather he kept Caranchini incarcerated

    for over 24 hours before bail was set and never did allow Caranchini to appear

    before him; his documents show the undersigned as "uncooperative" when the only

    thing Caranchini was "uncooperative" about was constantly asking when she would

    be allowed to bail out and when she would be told why she was in jail and when she

    would receive her insulin and other medications she needed as prescribed by ten

    doctors.

7.  The Honorable James Phelan, hereinafter referred to as Judge Phelan, is a

    Magistrate Judge in the Johnson County District Court and is located in the Johnson

    County District Courthouse at 111 Cherry Street, Olathe, Kansas; he is the "Judge"

8

who has "heard" the various matters regarding the charges brought against

Caranchini after Caranchini was released from jail until the matter was dismissed

with prejudice on October 10, 2017 at the request of ADA McElhinney. His

demeanor against Caranchini was awful and the worst Caranchini has ever

encountered by a Judge against her in 40 years.

8. John Fritz, hereinafter referred to as Fritz, is an ADA in the Olathe, Kansas District

Attorney's office who brought the charges against Caranchini that were made by

LPeck and RPeck against Caranchini in their Municipal Charge which charge was

filed January 23, 2017. Caranchini never met Fritz; Fritz never met Caranchini and

therefore never asked Caranchini any questions about the charges brought against

her by the Pecks, individually or jointly.

9. Stephen Howe, hereinafter referred to as Howe, is the "elected" DA for Johnson

County, Kansas and is in "charge" of the Johnson County District Attorney's office.

10. Michael McElhinney, hereinafter referred to as McElhinney, is the ADA that was in

charge of the Pecks' Municipal case against Caranchini and who dismissed the

charge (with prejudice).

9

A. Caranchini states the claims against LPeck, RPeck and the Pecks arise out of the common law of the States of Missouri and Kansas for filing two false claims against Caranchini—a Temporary Restraining Order/Restraining Order—which was denied by Judge Trigg on or about February 9, 2017 and a Municipal Charge against Caranchini for "harassing telephone calls and texts between December 24 and 29"-- according to conversations Caranchini had with the ADA McElhinney after David Bell withdrew (with Caranchini's consent) as Caranchini's counsel; and, for which Caranchini was arrested on or about February 9, 2017, put in Johnson County Jail that same afternoon, and bailed out of late on the evening of February 10, 2017 and remained pending until ADA McElhinney initiated dismissal of the charges (with prejudice) in early October 2017 with Caranchini's appointed counsel and which were never tried by the State of Kansas; for libel and slander by the Pecks for their numerous false statements on paper made to Johnson County and to the Johnson County Police Department on "tapes" of said communications with the Police and in making said false claims and in their filings made on said claims; for false statements made by RPeck in the hearing on the Restraining Order before Judge Trigg on February 9, 2017 as set forth in the transcript of said hearing; for claiming that he had sex with Caranchini in order to obtain "job references" and for alienation of affection by RPeck arising from the manner in which he carried on

_____

[3] A 'summation' of the legal claims is made hereinbelow for the claims against the Pecks individually and jointly and against JOCO to establish jurisdiction under common law, federal law, and injunctive laws; the facts actually supporting the claims are set forth more fully below.

his relationship with Caranchini over nine years and the manner in which he "dumped"[4]

Caranchini Christmas Eve 2016 after a nine year relationship on the day he was to

"move in"[5] to Caranchini's home after his dissolution  December 14, 2016 from LPeck

filed by her; for threats of physical harm by LPeck  to Caranchini that RPeck

communicated to Caranchini at the time of the initiation of the divorce by her and which

he repeatedly insinuated to Caranchini throughout the divorce and after the divorce was

finalized; for LPeck following Caranchini repeatedly; for her leaving beer bottles[6] on

Caranchini's property necessitating the installation of a $2,000 camera system to

protect Caranchini and her home from her;  and for leaving condoms by Caranchini's car

when Caranchini was at her physical therapist's office at Olathe South or while she was

at her Church answering the telephone Friday afternoon; and, RPeck's comments to

Caranchini about LPeck's continuing threats to Caranchini throughout the divorce and at

the time he "dumped" Caranchini, the latter being the reason he inferred to Caranchini

(at least in part) he was leaving Caranchini—to protect her from the continuing threats

of LPeck against Caranchini;  all of these claims (each) seek damages in excess of

$75,000.00 against the Pecks, individually plus punitive damages. Caranchini is a

---

[4]  "Dumped" is the word RPeck used with Caranchini on December 24, 2016 for ending their nine year "relationship" and also believed to have been used in correspondence with Caranchini over RPeck's name but which RPeck admitted in the TRO hearing was written by LPeck without his foreknowledge.

[5]  RPeck and Caranchini had discussed his getting a small house to move into after moving out of his old home which LPeck now owned.  Caranchini had tried to help him find a home but they could not find an affordable home so RPeck was going to move into Caranchini's home on December 24, 2016 until he found an affordable home.

[6]  Caranchini has not drunk beer or bought a bottle or six pack of beer in at least 15 years.  To find a "beer bottle" under her back porch steps was something that was clearly "placed" and the only person who would have done so is  LPeck who also placed the condoms by Caranchini's car!  RPeck did not drink beer or any other liquor at all nor did he buy any liquor of any kind.

resident of Kansas City, Missouri and the Pecks are residents of Gardner/Edgerton, Kansas and therefore under diversity of citizenship this case can be filed in the United States District Court for the Western District of Missouri, Western Division. Caranchini incorporates by reference the subparagraphs following Paragraph B below to further substantiate jurisdiction for her claims. Caranchini reserves the right to amend her Complaint upon more facts and evidence becoming available to her for claims or additional claims against each of the Pecks and/or the Pecks jointly.

B. Caranchini seeks to file claims against the Johnson County JAIL facility for the following actions which establish grounds for violation of Caranchini's constitutional rights under 42 U.S.C. 1982 et seq.

    1) For requiring Caranchini to give up her purse, briefcase, jewelry (some of it family owned for 75 years) before she was charged or made aware in any way why she was at the jail in violation of her constitutional right to have foreknowledge of why she was in jail and why her belongings were being taken from her by a County "jail";

    2) For requiring Caranchini to undress less than 20 feet from men in a large room surrounded by three to four woman one of whom was photographing her while Caranchini was required to undress down to her "panties" and remove her "bra" in the presence of these women (and men) all without being charged with any violation of any statute of any kind whatsoever; all in violation of her constitutional rights;

    3) For thereafter being placed in a jail cell again without being charged with any violation of any state or municipal code and told "when we get to you, we get to

you" and still not being advised as to "why" she was incarcerated all in violation of her constitutional rights to have knowledge of why she was incarcerated so that she could plea and post bond;

4) For thereafter being subjected to constant harassment by jail personnel who repeatedly and loudly told her "we are in charge and we have discretion to do whatever we want to you". This went on for hours on end again in violation of Caranchini's constitutional right to have knowledge of what she was charged and have the opportunity to bond out which was repeatedly denied when she made inquiry of what she was charged and when she could bail out all in violation of her constitutional rights;

5) That Caranchini repeatedly asked for food and drugs that she gave the jail staff a list of when they took her purse and brief case and she asked the staff repeatedly for her drugs but all they ever said to her was "we have discretion to do whatever we want to you" and they would not give her food she could eat or her drugs or let her see a doctor no matter how many times that Caranchini asked all in violation of Caranchini's constitutional rights.

6) That Caranchini was continually subjected to "taunts" by the male and female staff and told when they got to her they got to her and never was she ever provided a doctor, or her drugs or food no matter how many times she asked again in violation of her constitutional rights.

7) That she was subjected to "sexual licking" of her door window and when she pasted toilet paper she was told to take it down and refused and the Sheriffs stormed into

13

her cell and forced her into a corner and "sexually assaulted her by humping her back end and feeling her and would not stop although she screamed all in violation of her constitutional rights.

8) That the above are in violation of her constitutional liberties and no matter how many times Caranchini asked she was denied her rights to make a call, post bond, obtain information as to what she was charged and get medical help all in violation of 42 U.S.C. Sec 1982 et seq.

C.   Caranchini seeks to file multiple claims against JOCO for its written policies, its enforcement of its written policies, and its failure to have written policies governing those it takes into custody and incarcerates, for the actions of its elected DA Howe , the ADA  who filed the charge against Caranchini and the ADA McMcElHinney who managed Caranchini's case and the Sheriffs, "Assistant Sheriffs" and other employees in the "Jail" in Olathe, Kansas including a nurse and female employees, to which Caranchini was subjected leading up to her incarceration and during her incarceration in the JOCO jail on February 9 and 10, under 42 U.S.C. 1982 through 1985 and the Eighth Amendment to the United States Constitution, a summation of which claims appear as follows for the purpose of establishment of jurisdiction:

1) After charges were made by the Pecks to the office of the managing or Howe against Caranchini, as referenced hereinabove in Paragraph "A", said DA's office(s) failed to contact Caranchini to advise her of the charge(s) and determine whether Caranchini had a rebuttal, if any, to the charges to let her plead to the

14

charges and make bond on the charges in violation of her Eighth Amendment Rights as well as 42 U.S.C Sec. 1982 et seq.;

2) Thereafter, again without contacting Caranchini, the office(s) of the elected DA or the ADA McElhinney "somehow knowing that Caranchini was appearing in Judge Trigg's courtroom" on a "Restraining Order," appeared at the close of the hearing and had Caranchini arrested, cuffing her without advising her in any way of her rights, the reason for her arrest, giving her the opportunity to plea on whatever the charge(s) was or were, then, or at any time thereafter before she was released from jail, or thereafter; to make a call to her attorney and make bond all in violation of the Eighth Amendment Rights and 42 U.S.C. Sec 182 et seq.; at no time has Caranchini been given the opportunity to plea to any charge for which she was given the opportunity (finally) to make bond;

3) If the elected or managing DA's office(s) had done any "homework", it or (they) would have realized the charges in the Restraining Order were identical to the charges in the Municipal Charge and Caranchini having won the Restraining Order should not have been arrested for the charges in the Municipal charge but the matter should have been held for hearing; and either no bond set at all, or Caranchini allowed to bond out without being incarcerated; however, the office of the ADA McElhinney proceeded to have Caranchini arrested, without providing her the opportunity to plea to the charge or oppose whatever the charge was, and without giving her the opportunity to make bail. Caranchini was handcuffed in open court and brought to jail; all in violation of her Eighth

15

Amendment rights; said actions were also grossly negligent on the part of DA's

office and JOCO and could be libel and slander as well if there were others in the

courtroom and Caranchini is found innocent of said charges as she had just won

the TRO which were identical charges to the municipal charges ;

4) After being arrested and jailed at Johnson County, Caranchini asked the staff at

the jail, apparent managers, and even a nurse that came by, for her right to

make a telephone call regarding the jailing; she was denied this throughout the

36 hours she was incarcerated as the staff, including Sheriffs, repeatedly

informed Caranchini they "had discretion to do whatever they pleased with

Caranchini", including make a telephone call, no matter how many times

Caranchini demanded to make a call, she was denied this basic right guaranteed

to all incarcerated Americans; again, this is a denial of Caranchini's

constitutional rights and can be pursued under 42 U.S.C. Sect 1982 et seq;

5) Caranchini was denied basic due process regarding having knowledge of why

she was being incarcerated and held, her right to enter a plea on the charge, and

deny the charges as she was never given the reason for being handcuffed and

jailed at any time during her entire incarceration; a bail amount was set[7] without

informing Caranchini of the reason for the jailing let alone the "need" for bail;

and which had absolutely no relevance whatsoever to the charge that Caranchini

_____

[7] Caranchini was watching television on the evening of July 21 or 22 she believes and a mother
who left her two minor children under two years in her car at Oak Park for over two hours in
almost 95 degree weather amounting to child neglect and abuse was arrested and released on
a $2500 bond IMMEDIATELY.   It is outrageous that the bond was so minor and less than
Caranchini's bail and that she was released immediately and the undersigned was not.

later determined had been made and Caranchini was not advised of the amount

of bail at the time she was incarcerated;  only her sister who finally found her by

having Caranchini's neighbor call RPeck,[8] and asking where Caranchini was, could

it be determined what the bail amount was; all of this amounts to basic due

process violations under the 8th,  and 14th Amendments to the Constitution;

6) After being arrested and held for an indeterminate amount of time, Caranchini

was "stripped" of her clothes in the presence of men who were also being

searched, although she was "allegedly" surrounded by female officers; she was

also "filmed" as she was searched; again Caranchini had not been charged  nor

been found guilty of anything at this point in time and was treated as if she had

already been found guilty of some "wrong" or "minimally "accused" which she

had not;  it was humiliating; it was emotionally disturbing being watched by

women and men; and a disgusting abuse of "power" by JOCO and the elected or

McElhinney meant to make Caranchini want to avoid future jail and give up her

bond and take "diversion" thereby enriching, wrongfully, JOCO even though

---

[8] Caranchini's neighbor, who shall remain unnamed at this time except to refer to her as "CL", but who knows Caranchini well as well as RPeck who has done work on her home by way of reference from Caranchini, knew that Caranchini had a hearing that Thursday with RPeck on RPeck's Restraining Order and that she was due home mid afternoon.  When Caranchini did not appear home, she started to call various people that Caranchini knew to see if she could locate Caranchini and then started to call hospitals and the police.  She called Caranchini's sister in Tucson to inform her of the issue, and they agreed they would call RPeck.  CL called RPeck and he said "she's in jail but I never meant for her to go to jail".  It took about two more hours to get the information necessary to "bail out" Caranchini.  They arranged for a friend of Caranchini's , TB, to pick up Caranchini at the jail which he did do.  This also confirms what RPeck said to his attorney as he exited the courtroom while Caranchini was being handcuffed.  One has to wonder how Caranchini ended up in jail if RPeck did not want her in jail.  Was it LPeck?  Did the DA's office not inform RPeck that the Municipal charge would require Caranchini to be incarcerated?  These are questions to be answered in this lawsuit.

JOCO had proved nothing whatsoever; again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq and a denial of due process under the 8th and 14th Amendments to the Constitution;

7) After being "stripped" and given "jail pants"; Caranchini was after a substantial further period of time photographed and again treated as a common convicted criminal even though she was never given the charges, let alone given the opportunity to deny the charges; again, Caranchini requested a telephone call and the opportunity to make bail and again was told she would not have that opportunity as the "sheriffs had total discretion" and "you need to learn who is in control and need to be a 'good girl'" and "you are not"; again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq and a denial of due process under the 14th Amendment to the Constitution;

8) After that, Caranchini was placed in a jail cell and although she repeatedly requested her medications[9], a list of which were provided the jail personnel at

---

[9]  Caranchini did not want to attach as an "exhibit" this list of medications but will provide it to the Court as an "in camera" exhibit at the earliest possible time as she still has the "February" list in her laptop.  The information contained on this sheet was clear who could be called as three people had POA's and not only were the "drugs" listed but the doses, timing,  doctors who prescribed, their telephone numbers and fax numbers. **All the persons with "POA's" had this information as well because of the drug interactions Caranchini suffers from which have put her in the hospital at least 25 times in the last three to four years.**  There was absolutely no reason not to contact them.  Likewise, RPeck was aware who had this information as well and at the time was listed as a contact person I believe although he did not have a POA.  He knew of the problems that Caranchini suffered from if she did not have her medications.

the time she gave up her purse,[10] the jail personnel refused to give Caranchini

her insulin and other drugs; Caranchini again asked for a telephone call and

opportunity to make bail and the opportunity to talk to a doctor; all of which she

was denied;  again, this is a denial of Caranchini's constitutional rights and can be

pursued under 42 U.S.C. Sec 1982 et seq and a denial of due process under the

14th Amendment to the Constitution;

9)  Caranchini at various  points in time (but not the last ten or so hours) was given

food she could not eat as a diabetic:  two slices of moldy bread, a slice of

unidentifiable meat, stale potato chips and a cup of sweet sugar water or some

type of milk which she cannot drink.  Again, Caranchini demanded the right to

make a call, see a doctor and make bail and she was denied;  again, this is a

denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C.

Sec 1982 et seq and a denial of due process under the 14th Amendment to the

Constitution;

10) Caranchini  a few hours later asked for her evening insulin shot and medications

and she was provided none of them which were required for her to main normal

blood sugars and deal with her daily migraine pain which worsens with "bright

---

[10]  During the week of August 1 Caranchini believes she went to the office of ADA McElHinney
to leave a letter off for him.  She was asked to go to his office and meet with him, which she did
do.  During that meeting she pulled from her wallet the list of medications she carries at all
time, including at the time she was incarcerated, which shows the current drugs she is on, the
name of the prescribing doctor, the dosage, the timing of the drugs, and where and how to
contact the doctor by telephone and fax.  She explained to ADA McElhinney she pointed this
out at the time she gave up her purse when her clothes were taken from her that she needed
these medications.  Despite that, she told this DA she missed six rounds of medications and four
rounds of insulin which were listed on the then current list in her wallet.  He said nothing.

light"; again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq and a denial of due process under the 14th Amendment to the Constitution;

11) Caranchini remained in the cell and denied further food and constant requests for a doctor, a telephone call and opportunity to make bail; she was repeatedly told to "be a good girl" and denied her constitutional rights; again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq and a denial of due process under the 14th Amendment to the Constitution;

12) Caranchini was unable to sleep except for a few hours because of the light which intensifies significantly her migraines and keeps her from sleeping and causes constant pain which eventually has caused months of hip pain requiring physical therapy for months[11] on end because of lying on the floor and the lights in the cell aggravating her migraine situation; in the morning she was again refused any food she could eat; the right to make a telephone call, the right to make bail, the right to a physician to treat her health issues and numerous "morning" drugs, several of which were to treat her bad migraines; a nurse at a point in time sometime that day wanted to give Caranchini a "random" shot of insulin which

_____

[11] After almost five months of physical therapy and referrals to multiple doctors by her "Pain Doctor" M. Gupta Caranchini was informed that she needed a referral to Dr. Hess for possible back surgery. MRI's have now been scheduled for October 31 and surgery will be scheduled after that on Caranchini's lower back she has been informed. Caranchini used to walk three to four miles a day which RPeck is well aware of; however, since she was in jail, she has not been able to walk more than a half mile once or perhaps twice a day. Back surgery is definitely needed she has been informed this past week.

Caranchini's doctors did not want her to do, rather her endocrinologist wanted Caranchini on a prescribed dosage of insulin three times during the day at set levels and time periods none of which Caranchini was given in the 36 hours she was incarcerated; again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq. and a denial of due process under the 14th Amendment to the Constitution;

13) On Friday "morning" Caranchini believes-- but is not sure of exact times--, Sheriffs (one or two) started to make obscene licking motions on her jail window and started to "hump" the door; Caranchini screamed and asked them to stop but they would not; she used some peanut butter she found in her "breakfast bag or lunch bag" consisting of the same food as the prior evening (Caranchini had lost track of time), and smeared it on the window to the cell and pasted toilet paper on the window to keep the Sheriffs from seeing her; the effect of the lack of drugs (now three rounds of pills and three rounds of insulin were beginning to have a serious adverse effect), but the Sheriffs screamed at her. Again this is an abuse of Caranchini's constitutional rights to not be abused by a "jail system" especially in light of the fact that she was "innocent until proven guilty"; again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq.

14) That when Caranchini would not remove the "toilet paper" from the window three Sheriffs stormed into Caranchini's cell and physically assaulted her shoving her in a corner of the cell; jamming her arm up her back and touching her and

21

humping her in a sexual manner which Caranchini believed amounted to a sexual assault; Caranchini screamed as they dragged her out of her cell without shoes causing her toes to bleed and across the open cell compound; at a point in time Caranchini recalls her being photographed; she was then literally "thrown" into a cell without a toilet or water fountain or chair and told to "poop and pee on the floor" and when "they got to me, they 'got to me'" and "maybe you will learn who is in charge and how to be a 'good girl'";  again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq.

15) That Caranchini remained incarcerated despite repeated requests for the opportunity to make a call, make bail and despite one or two women officers coming to the cell door for unknown reasons, nothing was done; at a point in time some type of psychologist or social worker came to the door and said the staff thought Caranchini was "crazy" because of Caranchini's actions in continuing to scream and ask for food and a call; she said she did not believe Caranchini was "crazy" as the deputies were alleging and she would get her out of jail; approximately two hours later Caranchini was removed from the cell by a "lieutenant" and allowed to "bail out" as Caranchini's sister and neighbor had finally found Caranchini by calling Caranchini's "Rick Peck, Caranchini's ex boyfriend" and getting him to tell them where Caranchini was;  again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq.

22

16) When Caranchini reviewed the paperwork regarding her incarceration, after she was released from jail and David Bell no longer represented her, the jail staff made it appear that Caranchini was "uncooperative" and that was the cause for their actions; they believed she needed a mental examination; there was nothing wrong with Caranchini other than wanting her telephone call, her right to bail, her medications, food she could eat, and being treated as a human being and not being sexually assaulted in jail by men who were barely "intelligent" and "coherent" and were clearly intimidated by Caranchini's insistence on her rights;

17) Caranchini was put on a bond denying her the right to contact the Pecks and also denying her the right to "drink"[12] anything, denying her [13]drugs (which would include her medications she was taking because of the 'vague' nature of the bond) again without a hearing on the charges or opportunity to make any record of her defenses; again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq.

---

[12]  Caranchini is "Italian" and was raised "drinking wine with dinner from the time she was a young woman of `16". It is part of her culture. This particular bond requirement is loathsome to her and ridiculous as Caranchini has done nothing that would require curtailing her drinking red wine. Likewise, her friends and church friends who she socializes with and who she goes out with after "Pantry" which she is chairman of always ask her why she is not drinking. It is humiliating to say that she is on bond. It is also patently absurd as it has nothing whatsoever to do with the alleged actions of which she is accused. Caranchini might add she specifically had her appointed attorney ask Judge Phelan to release this requirement and he "blustered" and then said "no" without giving any explanation for the need.

[13]  This reference is vague and Caranchini takes 12 different prescriptions.

Case 4:17-cv-00667-GAF   Document 9   Filed 10/24/17   Page 23 of 70

18) Caranchini's friend TB[14] took Caranchini to the doctor and emergency care unit where she was found to have blood sugars of approximately 400 and blood pressure of 212 over 196 after 36 hours of incarceration and denial of four rounds of insulin and six rounds of drugs required by multiple physicians; Caranchini felt disoriented and had massive migraine pain as well as back and neck pain caused by not getting her pain medication to deal with her headaches; and other drugs as well; again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq.

19) Although Caranchini wrote two detailed letters to Howe, on Monday and Tuesday following being released, **SEE EXHIBITS 5,** about her treatment, and hand delivered these letters to his office, Howe never contacted her regarding the violations of her constitutional liberties in being jailed, suffering repeated refusals to make a call and post bond and the conduct of jail personnel in violation of her rights; nor did he allow her to make a record of her defenses to the claims made against her which remain vague, as the statute under which she was charged is unconstitutionally vague, and unstated to Caranchini or her criminal attorney to date, said refusal to delineate the exact nature of the claims, to address the violation of Caranchini's "constitutional rights" in jail;

---

[14] TB told Caranchini as he was driving her to the doctor that her "mug shot" was already "posted". Caranchini found it "amusing" that the DA could post her "mug shot" quickly but could not manage to give Caranchini information on why she was in jail or give her a telephone call or let her post bond! Nor would the jail give her food to eat. It was amazing what the system will do and will not do and the Court should take that into consideration. Caranchini's "reputation" was immediately smeared by the DA while Caranchini had no idea whatsoever what the charge was when her "mug shot" was posted!

again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq;

20) Further, after Caranchini retained a criminal defense firm, Wyrsch, Hobbs and Mirakian, to represent her , ADA McElhinney was handling the matter, not Howe, and he was provided a transcript of the hearing on the TRO which the Pecks "lost" and which made it clear there were no other grounds for pursuing any other claim—specifically the Municipal Charge;  yet McElhinney persisted in pursuing the charge and refused to withdraw the claim and insisted on continuation of the bond in violation of the "speedy trial" requirements and continuing to refuse to even obtain from Caranchini "her version" of what had occurred in response to the allegations of the Pecks who had now "lost" on the identical charges in a hearing[15];  again, this is a denial of Caranchini's constitutional rights and can be pursued under 42 U.S.C. Sec 1982 et seq.

---

[15] When the McElhinney asked to talk to Caranchini the week of August 1 Caranchini "thought" he would have some questions to "ask her", rather he just did what lawyers sometimes refer to as "the lawyer stare" while Caranchini explained some background and facts never taking her eyes off the McElhinney herself.  After all, Caranchini has been involved in law since 1976 and the McElhinney probably half that.   He never asked Caranchini anything although she was willing to answer any question he had and offered up her prescription drug list which he reviewed as well as his assistant who was in the room and other information.  Apparently, he just wanted to "eyeball" Caranchini for truthfulness.

## VENUE

The actions complained of with regard to LPeck and RPeck occurred in both Kansas and Missouri; the actions involving Caranchini's "jailing" occurred in the State Kansas but are premised on acts that took place in both the States of Missouri and Kansas; Caranchini is a resident at all times of the State of Missouri; the damages she suffered took place in the state of Missouri; to the best of Caranchini's knowledge, LPeck and RPeck are residents of the State of Kansas, County of Johnson; JOCO is an entity that is part of the State of Kansas. Actions involving the Judges occurred in the State of Kansas; Caranchini's "jailing" took place in the State of Kansas; court appearances took place in Johnson County, Kansas. Based upon these facts venue is appropriate in the State of Missouri where this matter is filed.

Multiple attempts have been made to resolve the issues against the parties named in this Complaint as "generally" set forth below; Caranchini based upon her past experience in settling cases since 1978, training as a mediator in 1993/94 and settlement of cases between 1978 and the present is willing to settle.

1) Caranchini attempted to settle with the Pecks by multiple emails in January of 2017 by sending them letters by email and leaving them a settlement letter on their front steps. RPeck sent a text to Caranchini mid January saying he would meet with Caranchini to discuss the matter but only if she agreed "in advance in writing" to not sue LPeck; Caranchini refused. Such a demand clearly indicated to Caranchini the "guilt of LPeck" or her intent to continually harm Caranchini of which the Court should take note. This all occurred before the hearing on the Temporary Restraining Order and before Caranchini was incarcerated. Also, the Pecks considered Caranchini's sending of proposed lawsuits "threats" under the Restraining Order and Municipal Code. Clearly, if that was the case, all trial lawyers would be in jail. The Pecks withdrew essentially these claims for her "threatened" lawsuits when it was explained to them that sending proposed lawsuits was not a "threat". It should be noted that Caranchini won the Temporary Restraining Order "hands down" yet the Pecks still did not come forward to try to settle the matter.

Additionally, after the hearing on the Temporary Restraining Order and after Caranchini was jailed on the Municipal charge, Caranchini retained a criminal defense lawyer to represent her on the municipal charge. Bell tried countless times to resolve the matter but the DA would not

---

[16] These only note with whom there were discussions and the general nature of the discussions—not particulars.

withdraw the charge unless the Pecks withdrew their complaints; the Pecks would not

withdraw their complaints unless Caranchini (among other things) agreed not to sue them and

not to have further contact for five years even refusing to produce themselves for deposition in

a suit against JOCO.   Caranchini refused to meet these demands given that the Pecks instigated

both the "Restraining Order" and the "Municipal Charge"—both arising under the identical set

of facts-- against Caranchini .  RPeck stated during the TRO hearing THERE WERE NO OTHER

FACTS**. Caranchini defended herself in the Restraining Order successfully and the Court called**

**RPeck a liar multiple times before finding against him on that claim.**  Caranchini and her family

have had to expend in excess of $12,000 for bond and legal fees to date and there are fees that

remain "owed".  ADA McElhinney, despite being provided the transcript of the hearing on the

Restraining Order, refused to withdraw the claim, which he eventually did without the consent

of the Pecks, and initially offered only diversion which Caranchini would not do as it is

tantamount to admitting guilt.

 The above was ADA McElhinney and the Pecks' position until the first week of October 2017.

At this time, Caranchini was informed by Jill Kenner, who had been appointed by the Court[17]

that suddenly McElhinney wanted to settle the case by dismissal in full of all charges, return

---

[17]  After Caranchini and David Bell "went their separate ways", Caranchini was "pro se" per her own choice.  The Judge in Division M3 did not want Caranchini  to proceed "pro se" and told Caranchini she was "incompetent".  To suggest that Caranchini is incompetent when she has practiced some 40 years in Missouri, Kansas, the Eighth, Ninth, Tenth Circuit Courts of Appeal, the United States Supreme Court, the MSPB and EEOC without any Judge every complaining about the quality of her work, is not only insulting but "rude".  When Caranchini protested, the Judge then suggested that I proceed "in forma pauperis" without knowing anything whatsoever about my financial status.  I started to tell him I was in foreclosure but……" but he cut me off and made me sign paperwork.  I was concerned given his demeanor towards me that he would literally "throw me in jail" if I refused to accept an appointment.  This is another charge against the defendants in this litigation.   Watching this Judge actions towards women in his Court was like watching women being treated in the 1970's –some 50 year ago.,

the bond, expunge the charges, and lift the no contact in part regarding the Federal lawsuit, and in toto as of January 23, 2018. This after pursuing this matter for 10 months and incarcerating the undersigned and causing her to incur over $12,000 in attorneys' fees and a bond of $4,000 in February (including costs). There was no explanation other than "it was taking too much of his time". Well, if there were sufficient grounds to bring the charge, and refusal to negotiate except a diversion, then one would think the ADA would have pursued it. Dropping the charge at the 11th hour is hardly a good policy and smells "badly" of something. It will hardly "look good" to the jury in this case. WHY would you drop a case after so avidly pursuing it for so long and causing a defendant to suffer for so long for some "phone calls". *This matter was ongoing over nine months at the time of dismissal over RPeck's refusal to tell Caranchini "why he was breaking up with her on the day he was supposed to be moving in nine years after their relationship started!"* Caranchini will have an offer at the time of mediation for the Pecks but the Pecks must understand that they have occasioned harm upon Caranchini financially, mentally, emotionally and physically and Caranchini is NOT the cause for this in any way at all. **The Pecks MUST PAY MONEY TO CARANCHINI, MUST GIVE THEIR DEPOSITIONS IN THE SUIT AGAINST THEM AND THE OTHER DEFENDANTS, AND CARANCHINI WLL NEVER AGREE TO A RESTRAINING ORDER OF ANY KIND KEEPING HER FROM SEEING OR TALKING TO RPECK IN THE FUTURE.** RPeck let Caranchini be incarcerated and LPeck caused that incarceration and he did nothing to stop it. As a result of that wrongful incarceration, Caranchini suffered enormously not only emotionally but physically to this day and now must deal not only with the actions of RPeck which were occasioned by LPeck's threats which caused RPeck to wrongfully end his relationship with Caranchini . Because of the incarceration and

29

lying on the jail floor, Caranchini suffered an injury to her left hip which she has had to have medical attention to, has had months of physical therapy on as well as other forms of medical attention, and now has been referred to a neurosurgeon for surgery on her hip to resolve the pain as of the date of this amended filing. Caranchini has had three different shots to help with pain without significant reduction of pain. Caranchini used to be able to walk three to four miles a day but is lucky to walk ¾ of a mile to one mile a day currently despite much medical attention and PT. Caranchini will make an offer to the Pecks at mediation but it will now require them to pay money to Caranchini; it will no longer have a restraining order as part of the agreement, and it will no longer have any other requirements previously made by them upon Caranchini. The Pecks instigated this entire "mess" as a result of LPeck's demands on RPeck to end his relationship with Caranchini or she would harm Caranchini and that is the bottom line. Caranchini has not occasioned any of the actions that have occurred. She is the victim of the Pecks' actions. Caranchini seeks BOTH INJUNCTIVE AND MONETARY RELIEF FOR HERSELF AGAINST THE PECKS.

The Pecks were mailed the lawsuit Priority Mail after the dismissal of the case consistent with the Court Order allowing contact with them regarding this case. It had not been provided them heretofore.

2) ***Caranchini has made a settlement offer to JOCO but has never even had the courtesy of a reply telephone call or email let alone a reply offer!.*** Caranchini has provided multiple drafts of the Complaint to JOCO but again no reply of any kind. In the last week Caranchini provided the Legal Office a filed copy of the lawsuit and heard nothing from them whatsoever. A demand was also made upon them in May but nothing was heard from them. Given that I am now suing two sitting Judges, three District Attorneys besides the County and the Jail, one would think that the Legal Office would call and make arrangements to accept service of process. But they have not. ***In the forty years Caranchini has practiced never have she ever been subjected to such rudeness from any defendant or their counsel at any time. Caranchini has always had cordial relationships. This is not the 1970's this is 2017 and you try to resolve disputes, not make them worse by stamping your feet and refusing to discuss the matter as JOCO is doing. It is "disgusting" consistent with their behavior.*** Caranchini has not contacted the DA's or the Judges directly for settlement.

3) **Request to Mediate at Commencement of Case:** Caranchini, consistent with Federal Court mediation requirements, will meet and mediate with all the defendants after commencement of case. She is willing to settle with less than all the defendants on some of the claims. This entire episode is nothing less than absurd as the legal file demonstrates unequivocally that jail personnel lied repeatedly as to what occurred in jail. Caranchini has been a trained mediator herself since the initiation of the mediation program in federal court in approximately 1993/94. She settled more of her cases than most lawyers and was a firm believer in the mediation program.

31

## FACTS COMMON TO ALL CLAIMS

### (The following facts are related to the Pecks until otherwise noted.)

1.  Caranchini met RPeck approximately eight to nine years ago when she was seeking to have some bids on some work on her home. She and RPeck established an immediate rapport and chatted the very first day about his marriage to LPeck as it was LPeck, a fellow real estate agent of Caranchini's, that had referred her husband to Caranchini to do work. They spoke for several hours that first day.

2.  RPeck informed Caranchini in that initial conversation he had just finished two years of counseling with LPeck regarding their marriage and their Pastor had told them their marriage was essentially "null and void" because LPeck had refused to engage in any sexual contact with him for almost two years as she was "having sex with God". RPeck said he was finding it difficult to divorce LPeck because of his vows. This was not a "typical" conversation you have with someone you "have just met".

3.  Caranchini and RPeck, as the above conversation demonstrated, had an almost "instantaneous" "connection" which neither could explain which was beyond "sexual". They did, however, engage in a sexual act in their first meeting which both were "embarrassed" they did; Caranchini had never ever engaged in sex with any man before they had dated for three to four months. RPeck claimed he had not either and he was "embarrassed" and said so.[18]

---

[18] Caranchini was not so naïve to believe that RPeck had not engaged in sex on a first encounter as men do this more often than women but he definitely was embarrassed.

4. RPeck and Caranchini did not have any contact for approximately two months after their initial meeting but RPeck subsequently initiated contact with Caranchini but Caranchini was too embarrassed by her sexual contact with RPeck to initiate a second contact and had another "contractor" perform the work. She agreed to meet him again in his truck, however, as she was curious about how she had "felt" when they first met.

5. Fortunately, or unfortunately, she had the same "reaction" to RPeck and they again ended up talking for several hours and then returned to her house and ended up in bed. It was very "bizarre" as they both said as they were "older" and had a strong attraction sexually and also could talk for hours to each other.

6. Over the next several years RPeck and Caranchini developed a friendship where they talked over the telephone about seemingly everything in their lives; they also engaged in occasional sexual contact; Caranchini also maintained a friendship with RPeck and LPeck as a couple initially, frequently going to their home in Wyandotte County for meals and even attending a birthday celebration for LPeck who she made a birthday cake for and also helping RPeck begin his new contractor business with numerous contacts she made for him with her real estate associates and friends which amounted to approximately $300,000 plus over eight years.[19]

---

[19] Caranchini is fully aware from a review of tapes of the Pecks' interview with the Police in their home that RPeck contends he slept with Caranchini "only "to get business. Caranchini believes that is what he told LPeck. But like many things RPeck said that were only partially true, it is yet to be "tested" during deposition. It may also be what he is telling LPeck as the reason for his alleged infidelity which is, if nothing else, "convenient". However, you don't "break up with someone" and give them "diamond earrings" and cry uncontrollably in their car

33

7.    During this time RPeck continued to maintain to Caranchini that LPeck would not engage in sexual relations with him and in fact informed Caranchini that she claimed she was "having sex with 'God'". He also maintained that she would not speak to him for days on end, and had no "interaction of any kind" with him. He also informed Caranchini that he had tried to "repair" the relationship by seeking further counseling with LPeck with a "Minister" but she was not interested in repairing their relationship. He was torn between his vows and his growing relationship with Caranchini he said which had developed from a friendship and casual sex into a deeper friendship and regular more meaningful sexual contact.

8.    Also, his Minister had told him that her lack of respect for her vows of having sex with him meant he was free to remarry if he chose as she had broken her vows to him. However, in conversations with RPeck, it became clear to Caranchini that he could not bring himself to divorce LPeck. As he often said to Caranchini: "It's not you, it's me." Based upon this statement, Caranchini believed her relationship with RPeck was "acceptable" even if he could not bring himself to "divorce" LPeck. Caranchini as a long time trial lawyer relied on her "evaluations" of clients and witnesses over the years and did not see any indication whatsoever that RPeck was "lying" to her in any way. (Given what has occurred since December 24, 2016 Caranchini was, and is, clearly wrong about her evaluation of RPeck's truthfulness)

9.    The relationship continued for initially several years as primarily a friendship and sexual relationship. Once or twice RPeck indicated he had sex with other women.

saying "you will never know how much I love you". We would call this "inconsistent" in the Courtroom—or perhaps for a jury to "sort out".

Some of these women Caranchini "knew"[20]; they were not women who would say "no" to an offer of sex in Caranchini's opinion and that is why RPeck asked them; he needed to be "needed" because both of his wives had "rejected" him.

10. About four years into the relationship it became more serious, and RPeck would daily call Caranchini once or twice a day, and often more frequently, and talk to Caranchini for hours; they would see each other once or twice a week as Caranchini and his time permitted. This continued over the next several years until December 24, 2016. During these years, RPeck gave Caranchini several pieces of jewelry, including annual "hearts" she wore as a necklace.

11. There were periods of time when RPeck could not see Caranchini because of work in other parts of the metropolitan area but the relationship continued uninterrupted.

12. Caranchini and Peck never "argued" or had fights which was consistent with Caranchini's relationship with her deceased husband over 34 years and her fiancé over two years.

13. RPeck always maintained he loved Caranchini during this time period; from time to time he would deal with wanting to be divorced from LPeck but had issues with his "vows"; RPeck and Caranchini, however, continued their relationship without interruption despite Caranchini wanting "more" of the relationship but understanding RPeck's "conflicts of conscience".

_____

[20] Caranchini has now learned from one of her friends, who shall remain unnamed in this filing, that RPeck asked her and her sister for sex while he was dating Caranchini!

14. In approximately August or September of 2016 RPeck informed Caranchini that LPeck wanted a divorce from him as she believed he was engaged in a relationship with Caranchini. RPeck decided it was not worth angering LPeck after discussions with her ex-husband who warned RPeck that LPeck could be vindictive and carry on the divorce for years if he did not agree to the terms she wanted. RPeck followed her former husband's advice and kept a low profile and gave her everything she wanted which included all interest in their home and in their bank accounts; he agreed to be out of the home by December 31 at 11:45 p.m. There was no agreement to provide her any money whatsoever after the divorce but she was to receive all monies in their joint accounts and RPeck's ownership in the home in Gardner, Kansas.

15. By this point in time Caranchini and RPeck communicated four to five times a day throughout the week. It was not unusual to speak morning and evening for at least an hour each time.

16. RPeck informed Caranchini at the commencement of the divorce that he was concerned about the guns and ammunition in the Pecks' house and that LPeck may harm Caranchini and he was therefore removing all the guns and ammunition from the home. He would not discuss the details of the divorce further with Caranchini and Caranchini did not "push" RPeck to go into the particulars as it served no

purpose. However, it was very clear that RPeck was VERY concerned that LPeck could, and WOULD, physically hurt Caranchini in some way.[21]

17. Throughout the divorce proceedings LPeck repeatedly drove up and down Caranchini's street and followed her car literally appearing "out of nowhere". RPeck was so concerned that he would only meet Caranchini to see her many weeks in an open parking lot in a shopping center fearing what she might do if she saw them together!

18. From time to time during the divorce proceedings Caranchini and RPeck discussed what type of a relationship they would have when he was divorced from LPeck; Caranchini made it clear she did not want to be married again nor did she want to live with RPeck full time; she wanted to have a committed relationship where they lived apart during the work week and they would be together on the weekends but each would maintain his/her own home. Peck never departed from his position he did not want to remarry and that he did not want to live full time with anyone. The only statement that Caranchini ever made to RPeck was that he could "move in" until he found a home to move into; she even looked for a home for him and had a real estate broker she knew look for a home for him.

---

[21] RPeck was very, very concerned during this time period that LPeck might see Caranchini and RPeck together. He was very cautious and Caranchini and he would meet in parking lots so as not to be seen together and to talk to one another. He constantly reinforced that LPeck might become violent towards Caranchini and Caranchini was beginning to become concerned. It was during this time too that LPeck seemingly followed Caranchini on occasion and Caranchini made sure to put her alarm system on in the house even when she went to see her neighbor across the street.

19. Caranchini never informed friends of her relationship with RPeck until the last year; she did inform her sister, Dr. Webber, and her daughter, Kelly Gross, who actually met RPeck and did not express any problems; her sister spoke to her and supported Caranchini in her decisions. RPeck never introduced Caranchini to his daughter claiming that she was divorced and it would be a problem; there were never any confrontations with LPeck at any time during the nine years of the relationship in person or by telephone, email or text, and Caranchini never made any "scenes" with anyone in his family, including LPeck, over the relationship.

20. Caranchini has always been "in love" with RPeck and repeatedly told him over the years that he was the only man she ever loved other than her husband, who was deceased. He never told Caranchini he was "not in love" with her or had questions about their relationship but led Caranchini always to believe by both his repeated statements of love to her and his actions that he was in love with her and professed repeatedly his love in phone calls and in person. He repeatedly told Caranchini he was "instantly drawn to her" when they met and he "could not explain" the feeling. He also told her repeatedly he was "in love with her" and it was like a "love" different from any he had ever had". Caranchini's neighbor who knew RPeck from work he did in her house always said that when he and Caranchini were in the same room there was a certain "electricity" between them and even if you did not know Caranchini and he had a relationship you knew "there was something between them" it was that "obvious".

38

21.   As the divorce was finalizing RPeck told Caranchini he wanted to go "hunting" with her and was looking forward to having nights with her and making love and having a relationship; he never indicated otherwise; Caranchini and he talked about their choice of "bed" and other things in Caranchini's home and that Caranchini needed a sofa for them to watch television on as they both enjoyed the same television shows. They talked about going around the country in a small caravan for a year. They talked about their choice of food and what they liked to cook and how to use a "pressure cooker".   In short there was no indication of any kind that their relationship was going to cease, it was only to go forward without LPeck to a new level of interaction and commitment.

22.   When it became clear that RPeck could not find a home to move into, Caranchini agreed to have him move into her home until he did find a home;  he was going to move furniture and tools in on the Thursday before Christmas himself and then have his daughter's boyfriend and his grandson move other items in on Christmas Eve; They were going to have dinner with "a neighbor" that Caranchini and RPeck knew on Friday evening and she prepared a special meal for them all to enjoy; on Saturday they were going to have a special Italian Christmas eve meal that was traditional in Caranchini's family and spend their first night together in almost nine years and have Christmas morning together.  It was the very first Christmas that Caranchini had not had with her daughter in 36 years or her grandchildren or a family member as she could not travel because of illness.

23.     On Thursday morning RPeck called Caranchini and told her he would be there that afternoon with tools.  He never showed nor called.

24.     On Friday the 23rd RPeck did not call which he always did; Caranchini was unable to reach him;  Caranchini's neighbor was concerned that LPeck had killed him as she was a gun fanatic and again RPeck did not answer calls or call Caranchini.

25.     On Christmas Eve Caranchini received an early morning call from RPeck asking to meet with her in Brookside (Missouri) and it was clear from the tone of the call that something was "wrong".  She thought perhaps he was going back to LPeck.[22]

26.     Caranchini met RPeck in Brookside; he got in Caranchini's car when she parked.  He gave her a set of diamond earrings and then said he was leaving her[23].  He said he did not want to discuss it in the car so Caranchini could ask questions. He got out of the car and they walked to Michael Forbes restaurant.   RPeck informed Caranchini he had talked to LPeck for ten hours (a conversation which appeared to Caranchini to have been "contentious") and "given it a lot of thought" and was leaving Caranchini and going back to LPeck .  (This since Thursday after a morning call!)

---

[22]     The circumstances of that morning when taken together and all that had happened since the beginning of the divorce overwhelmingly suggest to Caranchini that LPeck was threatening to physically hurt Caranchini if RPeck did not remain with her.  Over the years he talked repeatedly about her yelling and screaming and arguments about numerous "things". She had become "crazier".  Although Caranchini does not agree that this is the way RPeck should have handled this, in fact Caranchini believed he should have filed a charge against her with the DA, Caranchini  does believe that many things he did were done to "keep her happy" and not harm Caranchini.  In point of fact, Caranchini believes that the elected and McElHinney's should file a charge against LPeck for threatening Caranchini as the evidence develops in this case and as the DA's review all the facts that Caranchini has relayed that RPeck informed her of from December 24 forward.

[23]   In an earlier draft of this document Caranchini indicated he gave her the earrings after breakfast but in fact he gave them to Caranchini when he first saw Caranchini.

40

RPeck would not answer any questions whatsoever from Caranchini about what had transpired since they had talked Thursday morning when he had said he would be over with his tools Thursday afternoon .   RPeck mostly sat silently during some breakfast and would not answer any questions.   After breakfast Caranchini and RPeck walked to their respective vehicles where he got into Caranchini's car, which Caranchini was shocked at, and started to cry with—tears running down his face. He said he loved Caranchini and always would and "that Caranchini did not know how very much he loved her and never understood how much he had loved her and always would";  and without further "ado" exited Caranchini's car.  Caranchini sat there flabbergasted and crying in a state of shock.  He NEVER  said 'why he was leaving!

27.     The only explanation for this statement and RPeck's conduct is that RPeck believed he needed to protect Caranchini from LPeck.  You can lie about many things; but "faking tears running down your face" is not one of them.

28.     It should be noted at this point in the recitation of the facts, that LPeck contends that Caranchini started to call RPeck Christmas Eve—see her Complaint.  Obviously, she did not realize that RPeck had not yet told Caranchini until Christmas Eve morning that he was breaking up with Caranchini as LPeck and RPeck had had "sex" that morning according to RPeck during his communication with Caranchini that morning.

29.     Caranchini went home and called her sister and daughter and numerous friends of many years telling them all what had happened and all were shocked and consoling

41

her unable to understand what had happened given their knowledge of the relationship.

30.     Caranchini called RPeck over the next week, as well as texted him, and told him she had questions and wanted some answers to questions as he had not given her time to digest what he had said. He answered that first or second call and said he would, but he never has met with Caranchini and refused to take any further calls, emails or texts from Caranchini after that initial first or second call that Caranchini initiated. He has never told her "why". However, RPeck NEVER told Caranchini on Christmas Eve not to call him. In fact, until Caranchini's calls were blocked sometime around January 18, Caranchini did not know he intended on doing so! This was a point that Judge Trigg made during the trial; that is, if he really did not want Caranchini to call him after December 24, why didn't he immediately block her calls and emails.

31.     RPeck has never explained the rationale for his leaving Caranchini and going back to the woman who he repeatedly told Caranchini had made his life "hell" for years on end. Despite attempts by Caranchini to obtain some "answers" he never responded to Caranchini's attempts to get some "answers". He also never told her not to call or he would seek a TRO against her or file a Municipal Charge against her. Until Caranchini was served with the TRO at her home in late January and arrested in Judge Trigg's courtroom after winning the TRO she had no idea there was a Municipal Charge as RPeck never made any mention of it to Caranchini.

32.     The only thing RPeck told Caranchini on December 24 was if she (LPeck) did not do

what she said she would do (have sex with RPeck), he would leave. LPeck told RPeck

she would have sex with him (although she had not for years). She always claimed it

was too painful.[24]

33.     RPeck informed Caranchini on December 24 that LPeck had had sex with him

December 24 (before he had met with Caranchini) and that she had rubbed

"frankinsense" on her belly and said it did not hurt anymore which Caranchini

laughed hysterically over. But after RPeck left Caranchini cried all Christmas Eve and

has cried almost daily since that time. It was the worst Christmas since her husband

had died in 2003.

34.     Caranchini does believe given RPeck's statements about LPeck's threats about

Caranchini that she would harm Caranchini that he believed he needed to stay with

LPeck to keep her from physically harming Caranchini. And, given that Caranchini as

set forth below believes LPeck has followed her and left beer bottles on Caranchini's

property and condoms next to her car door and followed her on the highway,

Caranchini believes she would harm her. Other than this, Caranchini can find no

explanation as to why he would go back to a woman who took every dime from him;

did not tell him where she was going for days on end; never slept with him sexually

for years on end when she knew that a sexual relationship was an important part of

---

[24] Apparently, LPeck is the only woman in America who does not know there are over the counter "drugs" so to speak to take care of "dryness" from menopause. The first time she had sex with RPeck, December 24, she "rubbed her stomach with frankincence" and suddenly she had no pain from intercourse! In Caranchini's opinion that says it all about LPeck "refusal to have sex" and RPeck's gullibility as well.

a relationship for him; and, who he assumed knew of the relationship with Caranchini as it was not exactly "hidden".

35.    RPeck never gave Caranchini any explanation for his actions either on December 24 or since that time; except to infer both at the inception of the divorce and on December 24, 2016 that LPeck would "hurt" Caranchini as he referred to the guns in their home and he was removing them; there was also a "strange" telephone call in January in which RPeck said he would meet with Caranchini but only if she agreed in writing beforehand not to sue LPeck .

36.    RPeck has never apologized to Caranchini or made any attempt to make Caranchini understand his actions although Caranchini has attempted to contact him by text, telephone and email on numerous occasions to understand what she had, or had not done, to cause these totally unexpected actions which were contrary to every conversation they had ever had about his relationship with LPeck and his daily voiced love for Caranchini. [25] The filings made in the Municipal Court have been very hurtful to Caranchini and Caranchini believes that LPeck forced RPeck to make the filings and that he did so because she forced him to do by threatening Caranchini with physical harm.

_____

[25]  Of course, after reviewing the tapes of LPeck and RPeck's meetings with the Police over their Municipal charge they were filing against Caranchini it is clear that RPeck was perhaps lying to Caranchini over the years about the nature of their relationship, or was lying to the Police about the existence of the grounds for the Municipal Charge.  The two are totally mutually exclusive. A deposition of both the Pecks and perhaps of the Police will be needed in this litigation to resolve the issues of libel and slander and to whom RPeck was telling the "truth".  It should be noted that Caranchini reviewed these tapes as part of the discovery in the Municipal Charge case provided by the McElhinney on the case to her criminal attorney.  They will be requested in this civil case to be used as part of the evidence in this case.

37.   RPeck repeatedly told Caranchini over the years when they talked about his leaving

LPeck "that it was not you (Caranchini), it's me" referring to his leaving LPeck.  It was

clear from those conversations that he had an "issue" leaving LPeck which he could

not "deal with" or "resolve".

38.   Caranchini was concerned that after the divorce was final that LPeck would continue

to make threats to RPeck about what she was going to do to Caranchini if she knew

RPeck was continuing to see her and that RPeck believed he needed to be with

LPeck to protect Caranchini from LPeck's threats to Caranchini.

39.   When Caranchini had not heard from RPeck, she went to the home in early January;

Caranchini parked off[26] the property as she did not see RPeck's vehicles or LPeck's

vehicle.  Shortly after parking, LPeck came racing down the dirt road to their home

pass Caranchini's car; shortly thereafter, two Police vehicles arrived on the scene.

Since Caranchini had done nothing wrong and was not on the property, she did not

engage in any conversation with the officers other than to explain what had

happened[27].  Clearly, LPeck had called them and had not informed them of all the

---

[26] Shortly after the Pecks bought the Gardner home in 2007 or 2008 it appears it was
determined it did not meet the Homes Association's requirement of three acres. LPeck "tried
to fix the problem" but only made it worse. RPeck asked Caranchini if she could fix it.
Caranchini looked at the paperwork and realized that LPeck had actually made the problem
worse.  Caranchini fixed it, but it probably took almost $5,000 worth of legal work.  Caranchini
NEVER CHARGED THE PECKS A DIME although Caranchini probably mentioned to RPeck that it
took $5,000 "worth" of legal work to "fix the problem LPeck had caused".  However, on one of
the tapes Caranchini reviewed in the criminal charge LPeck claimed that Caranchini actually
charged them $5,000 which is totally false. (That was but one of many lies she told the Police
on that tape). It took $5,000 worth of legal work to fix what she had "screwed up".  The Pecks
did not have such money and Caranchini knew it.  They never offered to pay Caranchini a dime.
[27]  There is also a tape of this encounter with the Police and Caranchini which is rather short.  It
confirms Caranchini's summary.  Caranchini saw this tape which was obtained during discovery

facts. Just as clearly she had "listened in" on a message Caranchini had left for RPeck about the issue. They asked Caranchini to leave and Caranchini left. (There is a video of this from the Police produced during the discovery on the Municipal charge which Caranchini has viewed).

40.     RPeck, when Caranchini left a message regarding what had happened, informed Caranchini that he had not called the Police but that LPeck had seen Caranchini on the highway and recognized "her" and Caranchini's car. RPeck said LPeck had accessed RPeck's email (or text—Caranchini cannot recall) and found out Caranchini was going to see RPeck to obtain "answers". [28]

41.     This was very unsettling to Caranchini as she had not seen LPeck in years which LPeck admitted in the video of a meeting with the Police regarding filing a charge (again something that Caranchini has seen) and Caranchini had lost 45 lbs since the last time she saw LPeck, and changed her hair color and her car. It was clear that LPeck had been at Caranchini's house and "seen her and Caranchini's car". RPeck had said he believed she was following him during the divorce. There is no way that LPeck could have recognized Caranchini's car or her "on the highway" given such facts.

42.     Additionally, on at least two subsequent occasions in January, Caranchini believes that LPeck was following Caranchini when Caranchini was driving.

---

obtained on the Municipal Charge from her criminal attorney and will be obtained as part of discovery in this case.

[28]  There was another version of this "story" by RPeck; that is, that LPeck accessed his phone and got the information. Caranchini told him that she, Caranchini, did not give permission to anyone to access messages she left; but then RPeck said HE gave permission to access the message. RPeck was clearly trying to protect LPeck accessing his phone.

43. Additionally, in January, on two occasions a "condom", out of its wrapper, was left outside Caranchini's driver side car door—once when she went to her physical therapist at Olathe South and on the same day when Caranchini was at her Church answering the telephone which Caranchini did every Friday afternoon. Caranchini did not "pick up" and retain the condom(s). But the question is what type of person follows someone and drops an unwrapped condom by a driver's side car door twice in the same day?

44. At a point in time after the bond was in place a "beer bottle" appeared in the back of Caranchini's home out of nowhere. Caranchini has not drunk beer in almost 20 years and certainly not bought beer. RPeck did not drink at all. Clearly, LPeck wanted to somehow claim that Caranchini was in violation of her bond.

45. Caranchini believes these were actions by LPeck . After the "beer bottle incident" Caranchini has had installed an ADT monitoring system on her home to monitor approaches to her home which cost almost $2,000.00 which is in addition to a high level ADT alarm system on the home's doors and windows she had installed after multiple break in attempts several years ago which she now wonders weren't occasioned by LPeck. Despite the latter, the alarm has been breached and rung which ADT cannot explain as accidental. Considering that RPeck has been concerned that LPeck has followed him to Caranchini's house or come to Caranchini's house, it is possible it is she who was the cause for the alarm breaks.

46. Caranchini received in mid January a very nasty email allegedly from RPeck late one evening of approximately four pages, attached as an exhibit to this filing as

47

**EXHIBIT 1** . It was totally shocking as it took statements made to Caranchini by

RPeck out of context and twisted them in a manner to suggest Caranchini and RPeck

had no relationship or it was merely based upon sex throughout the nine years.

After Caranchini wrote numerous emails or texts disputing the four page letter, she

talked to her sister, who after reviewing the letter, informed Caranchini that

obviously RPeck had not written it, but it was written by LPeck which RPeck did not

deny at a hearing on the Temporary Restraining Order filed by him and LPeck.[29]

47.    Caranchini  only received in early August from her criminal attorney Bell[30] the

paperwork filed by LPeck[31] against Caranchini regarding her telephone calls to RPeck

immediately after his breaking up with her on December 24.  Caranchini had no idea

that the charges against her stemmed from that time period to December 29.

Likewise, the only thing that Caranchini did during that time period was make

telephone calls and send texts to RPeck which was consistent with their relationship

of nine years.  Caranchini might add that when RPeck broke up with her HE NEVER

---

[29]  Caranchini gave this letter to RPeck at the time of the first hearing on the Temporary
Restraining Order as she intended to make it an exhibit.  He opened the envelope it was in and
it was clear from his looking at the document that he had never seen it before.  He nudged
LPeck and pointed to the letter and she "shrugged her shoulders".  He would not look at
Caranchini after that.  It was very clear he had not written the letter and that LPeck had.
[30]   Bell when he was hired shortly after Caranchini was released from jail in February
apparently determined that Caranchini was extremely ill over what had occurred and did not
share with her all that the Pecks had done because of her state of mind over what the Pecks
had done to her.  In point of fact, Caranchini only learned on July 28 from Bell when he
provided her documents from the Court files when he withdrew of many of the filings made by
the Pecks on the criminal matter.  This lawsuit had to be redrafted (again) and its filing
postponed because there was a need for more additions.
[31]   Apparently, LPeck was filing the paperwork shortly after RPeck told Caranchini he was
leaving her, something which Caranchini did not know until July 28 of this year, making the
whole circumstances even worse.

EVER TOLD CARANCHINI NOT TO CONTACT HIM AGAIN. HE NEVER BLOCKED HIS
TELEPHONE OR TEXTS OR EMAILS UNTIL SOME TIME IN MID JANUARY WHEN
APPARENTLY LPECK WAS INSISTING ON THE FILING OF A TRO.

48. Likewise , in this paperwork LPeck contends that Caranchini is in need of a "mental
examination".[32] Nothing could be further from the truth. Caranchini has seen a
psychiatrist off and on for various reasons[33] over the years who was fired by the
undersigned because she was overmedicating me. A new psychiatrist was hired and
after seeing Caranchini multiple months wrote a full report to Caranchini's doctors
on Caranchini's mental state and Caranchini was removed from all her psychiatric
medications less than eight months ago. However, neither psychiatrist ever
indicated that Caranchini had any "psychiatric" issue as referenced by LPeck.
Reviewing the tapes of the Pecks with the Police, it is the Pecks who are in need of
psychiatric examinations given their statements and their conduct; not Caranchini.

49. Caranchini for some reason is shown as "Uncooperative" on one of the documents
in Judge Vokins' court. On what basis this statement is made is unknown but after
reading it again it appears that the jail personnel in order to "protect themselves"

---

[32] Caranchini is pretty outraged that an ADA (Fritz) put on a Court document from a
complainant who has a GED education that Caranchini is in need of a "mental examination"
which is libelous and slanderous per se. Caranchini's medical records establish she has no such
problems whatsoever and that such a statement would be included in a court record without
any substantiation whatsoever demonstrates that the District Attorneys' office clearly has done
no investigation whatsoever into the charges against the undersigned.

[33] Caranchini suffered the loss of her father in August of 2002, of her mother in January of
2003, of her husband in August of 2003; she had money taken from her from her attorney in
2004; her husband's illness wiped out her investments, her family jewelry was taken from her in
2005 by a 'friend', she lost $4million in an investment in 2006; her fiancé also died in 2006; she
suffered numerous illnesses for years thereafter and many other issues thereafter.

falsified the facts. Caranchini had been asking to make bond and for a telephone call since shortly after they put her in a cell. Hours went by and nothing was done. She then started to more loudly ask for a call, about bond, and now for her meds and insulin which they refused to give her. Additionally, no food was given her which she could eat on her strict diet because of her diabetes and she again started more loudly to ask for food, her meds and insulin. All Caranchini heard from the guards was to "be a good girl"; "we have discretion" and "we can do whatever we want with you"; a full day of this went by and no telephone call; no drugs, no food Caranchini could eat, no insulin. The guards just kept saying "they had total control" and Caranchini had to be a "good girl" No one ever contacted Caranchini and no one has ever found Caranchini to be "uncooperative" at any time in any matter whatsoever. But Caranchini started to yell and the guards started to lick her cell door and "hump it". Caranchini started to yell and scream and they opened the cell door and came in and yanked her arm behind her back and "humped her" and dragged her out of her cell screaming and kicking. It is clear from a review of the paperwork that they failed to tell the Court exactly what "led up to Caranchini yelling and screaming". However Caranchini is setting forth in this lawsuit what exactly happened and will have the jail produce every person that worked that time period for Caranchini to identify them and all the records of those who worked.

50. This is typical Caranchini has found in her 40 year of practice: defendant "leaving out" a "few key issues" in a bad situation. Well, we will see what a jury believes.

51.    Going back to the paperwork that RPeck filed, it is clear based upon the criminal paperwork, that RPeck was responding to the demands of LPeck who wanted him to immediately stop his relationship with Caranchini when he had told Caranchini on December 22 he was to move in with her; LPeck's divorce from RPeck was based upon his relationship with Caranchini and it had been finalized on December 14. The Pecks had NOT remarried at the time LPeck made these demands upon RPeck. The only rational was that LPeck was threatening Caranchini and RPeck believed he had no choice but to leave Caranchini to protect her.

52.    On February 9, 2017 Caranchini appeared in Court on the Pecks' Temporary Restraining Order; RPeck appeared with an attorney, but LPeck did not appear. Prior to the hearing Caranchini approached the attorney and RPeck and asked the attorney's name which he refused to give her! He also told Caranchini he was asking for a 30 day continuance (which he should have known he probably could not get). He also said he would "beat the shit out of her (Caranchini)", which he did not do— they lost when the continuance was denied, and the case was tried and the Court ruled on the evidence. This and his continual passing paper to his client with "answers" during the hearing was extremely unprofessional.

53.    RPeck testified, was asked questions by Caranchini and the Court; Caranchini testified and was asked questions by the Court; the Court then entered an order after calling RPeck repeatedly "a liar", denying the Restraining Order Request.

**The following Facts are Directed *PRIMARILY* to**
**JOCO, ITS JAIL EMPLOYEES AND CONTRACT EMPLOYEES**
**ITS ADAs McElhinney and Fritz**
**And THE DISTRICT ATTORNEY STEPHEN HOWE**

### A. JAIL

54. It should be noted—again-- that Judge Trigg stated during the hearing that RPeck never blocked Caranchini's phone calls or texts or emails until a point in mid January when Caranchini was denied access to RPeck's telephone and email, and it is not known whether that was done by RPeck or LPeck. Judge Trigg noted that if RPeck did not want to speak to Caranchini prior to that time, why did he wait so long to restrict Caranchini's calls and emails.

55. Caranchini contends that it was not RPeck that blocked her calls and emails, but that it was LPeck who blocked the calls and emails on RPeck's phone and email, perhaps with RPeck's consent after the fact—but Caranchini doubts that unless LPeck pushed him and threatened him-- but RPeck never answered Judge Trigg's "statement" on this issue when the transcript is reviewed.

56. At the conclusion of the hearing, three Sheriffs came into the Courtroom and started to handcuff Caranchini. Caranchini was dumbfounded and the Court informed Caranchini she was being arrested on a separate charge brought by the Pecks. The Judge was clearly disturbed by the arrest and indicated to Caranchini that she did not have jurisdiction of the other case. The question is "Why?" (See claims against Judge Vokins).

57. Caranchini saw RPeck and his lawyer leaving the Courtroom and heard RPeck saying to his lawyer that "(he) never wanted her to go to jail".[34] The lawyer mumbled something and they left. RPeck had said the same thing to CL[35] when she called him to find out where Caranchini was when she did not return home .

58. It should be noted that although it is clear someone knew Caranchini was going to be in Judge Trigg's courtroom and Caranchini could be arrested, why had not bail been set before that time? Why did it take a full day in jail before bail was set after Caranchini was arrested when the charge had been made by ADA Fritz on January 23, 2017?

59. This action of maintaining a person in jail when that person has not been charged and refusing to provide her medicines as set forth below and foods as necessitated by her medical conditions is a violation of her constitutional rights. It is, quite frankly, nothing less than disgusting and Judge Vokins and the Howe, should be held accountable for such process or lack of process that subjects individuals to this conduct.

60. That Caranchini was not brought before Judge Vokins after the charge against Caranchini was put in place (January 23, 2017) and before February 9, 2017, and instead the Court and the ADA Fritz waited until she was in Court on another matter and then handcuffed her and brought her to the jail is an intentional act meant to

---

[34] If RPeck did not want Caranchini to go to jail, WHY was Caranchini in jail? Did ADA Fritz who took the complaint not explain to the Pecks that Caranchini would be put in jail? If that was the case than ADA McElhivinney was negligent in his obligations to the Pecks and Caranchini and Caranchini has a right to sue him as set forth hereinbelow.

[35] "CL" is Caranchini's elderly neighbor who knew RPeck and who had RPeck do work on her home.

intimidate Caranchini and cause her to want to forfeit her bail and plead guilty so
she does not have to subject herself to the "jail experience". Why else would the
Court and ADA Fritz wait until Caranchini was in Court on the TRO to arrest her and
then intentionally not advise her of the charge and hold her 24 hours or more before
setting bail and almost 36 hours before permitting her to bail out on a charge she is
not even aware of until the bond money is paid!

61.    Caranchini was then brought to the Johnson County jail by three[36] police officers.

62.    When Caranchini arrived at the jail, her belongings were then taken from her
including jewelry that had been in her family for many years and which she was very
concerned about. Her wallet had cash in it at the time it was given over and she had
to sign for her belongings. Her briefcase had been gone through as well as her purse
and Caranchini pointed out the list that had her medications on it. Caranchini
believes this is where she had to give over all her jewelry. Caranchini cannot recall
whether this is where she was given jail pants and whether this is where she had to
take off her bra and was left only with her sweater on.

63.    Caranchini was not given the opportunity to make a call and she was not told why
she was in jail; nor was Caranchini given the opportunity to bail out. There was no
reason whatsoever why she had to remain in jail as she had no "jail history" or
violent history of any kind whatsoever and she was not being accused of any
violence against the Pecks. RPeck personally knew that Caranchini did not have a
weapon in her home and did not know how to use a weapon. Why was the Court

---

[36]    Caranchini believes there were three officers but there may have been two as Caranchini
was so "dumbfounded".

keeping her in jail? Why was she not allowed to bail out immediately? These will be questions to be answered during this litigation as the "jail experience" has caused Caranchini to suffer deeply physically as well as emotionally.[37]

64.  Caranchini was then brought into a large room where with three women "surrounding her" was "stripped of her clothes" and searched; this was less than 15 feet from men being likewise "stripped" and searched who could easily see Caranchini as Caranchini saw them and there was a video taken of Caranchini being stripped and searched. Again, Caranchini asked to make a telephone call and asked why she was there and what were the charges; she was not told and was not allowed to make bail. Caranchini had no idea why she was in jail whatsoever.

65.  Caranchini was then placed in a jail cell where she was the only person; she was not given the opportunity to make a telephone call or post the bail even though she asked the Sheriffs to do both. They just refused to answer or do either throughout the entire time she was in jail. They never told her why she was in jail in any way or gave her any paperwork as to what the charges against her were or gave her an opportunity to dispute the charges all of which denied her constitutional rights.

66.  Caranchini learned when eventually her sister bailed her out by telephone that the bail had been set at $4000.00 with costs![38] This amount, considering that Caranchini

---

[37]     As of the filing of this Amended Complaint Caranchini still sees her Psychiatrist and new Psychologist regarding her "breakup" with Rick and her jail experience; she has been referred to a neurosurgeon for surgery on her hip for the daily pain she still suffers from lying on the jail floor.
[38]     This will be the subject of discovery in this case to determine how bail is arrived at; whether there is consistent amounts, and if not why not, whether this amount was consistent with other amounts for this "crime" and if not why not. Consistent bond amounts will be the subject of

had no history of any criminal charge and the events of which she was charged, which were vague and ambiguous, she was not physically threatening, is outrageous! If this is the amount used for this type of "charge", what possibly can be the amount for a serious charge that involves physical threats.

67. Caranchini also immediately upon being jailed asked for her medications which were then due.[39] She was denied same and denied same throughout her 36 hours in the jail and was only offered one pill which was out of schedule in a wrong dosage and a dosage of insulin which was incorrect in timing and amount; Caranchini never had her regular medications or insulin dosages over the 36 hours which amounted to six different administrations during the time of her incarceration. She was never given the opportunity to see a doctor and the alleged nurse who came by told her "take what we give you or get nothing".

68. Caranchini's original cell had a toilet out in the open and sink to get water and a bench. There was nothing else in the cell and the lights "blared" 24/7 which increased Caranchini's migraines almost immediately; Caranchini's cell door was half glass and anyone could see in while Caranchini was using the "facilities".

---

injunctive relief in this case. When Caranchini went to the Jackson County Jail at 75th and Paseo and asked them what the amount would have been for this "crime", they said $400.00. They were shocked by the $4,000.00 amount that Caranchini paid.

[39] The sheet which Caranchini referenced when she gave her clothes over had all her doctors names, telephone and fax numbers. It also had each of Caranchini's drugs, doses, and the timing of the drugs and which drugs had to be given with other drugs. The list also included all drug allergies. Caranchini has to take drugs within one half hour of 6:30 a.m.; 12:30 p.m., 5:30 p.m. and 8:30 p.m. This includes doses of insulin "r" and "n". There are approximately 10 different prescription drugs Caranchini takes. Caranchini was in the jail long enough to miss four rounds of insulin and six rounds of prescriptions. It has too much personal information to be attached as an exhibit to this document but will be submitted as necessary in camera.

69. Caranchini repeatedly asked for her meds, a telephone call and bail but was denied same and was told "you don't get it, you are going to do what we say and we are in charge and we have total "discretion".

70. Caranchini was not given any food she could eat on her limited diet; rather, she was given stale moldy bread with moldy cheese or meat, stale potato chips, some peanut butter and fruit juice that was 100 percent sugar; she complained and was told take it or not but you won't get anything else. Two other "meals" identical to this "meal" were given her, none of which Caranchini could eat.

71. During this time at a point the sheriff deputies started to come to the cell and press their faces against the window and lick the window and hump the door making "noises". Caranchini finally took some toilet paper and pressed it with the peanut butter on the window so the deputies could not glare at her and "lick" the window; they demanded she give them the toilet paper and take down the toilet paper on the window; Caranchini refused; they then stormed into the cell slamming Caranchini against the wall in a corner and yanking her arms behind her back and leaning against her rearend in a menacing sexual manner and humping her in a sexual manner. Caranchini was dragged out of the cell without her shoes and her feet started to bleed and she was screaming; someone started to take pictures.

72. Caranchini was then put in a cell without a window on the cell door, without a toilet and without water. She was told to "poop on the floor and pee and drink her pee" and she was given only one bag with the some food and no water. She was unable to eat and at one point in time when moved to the second cell she was given no

57

water whatsoever for some ten to twelve hours. No meds were given her and no nurse ever came by. An officer came up and said to her that when they got around to food and water they would get to her.

73. Jail Staff continued to refuse to provide her the opportunity for bail or a telephone call or meds although Caranchini repeatedly asked for same.

74. When obtaining the paperwork from the jail from David Bell, Caranchini's attorney, it appears that jail staff described Caranchini's conduct as "uncooperative". If asking for a telephone call, asking to bond out, asking for meds including insulin all of which are constitutionally provided is being "uncooperative" then Caranchini was uncooperative .

75. Caranchini has had severe migraines on a daily basis for approximately three to four years. She heretofore had thrice a year botox shots to "contain" them. Since the initial draft of this "complaint" she has seen her new "botox neurologist" (for headaches) who is "upping the botox shots to four times a year". She also takes daily doses of drugs to assist in mitigating the migraines replacing the old drugs she was taking. These drugs have also been increased since the initial draft of this Complaint forwarded to the defendants because of increasing painful headaches. The "light" in the cells which was nonstop for the 36 hours increased her migraines to the point it was several months before she could actually "work" or "concentrate" after being released. The stress from dealing with this matter has caused her migraines to increase in severity and they continue to this time which is several

months after the incarceration.[40]  The incarceration and what occurred in the jail continues to give Caranchini nightmares.  Caranchini started to see a psychologist as well as a psychiatrist more frequently to deal with the stressful events.  It was several months before Caranchini could sleep more than four hours at night and only the last several weeks since Caranchini has been able to sleep seven hours a night again even with a prescription sleep aid.

76.     Eventually a psychologist or social worker (Caranchini is unsure which) came to the cell and told Caranchini "they" (the police staff) thought she was "crazy" because she kept "yelling".  Caranchini asked the woman if they said "for what" and "she just smiled".  "Caranchini smiled back".  She then said she would try to get Caranchini out of jail.  Approximately two hours later the door opened and Caranchini was escorted to the exit to pick up her clothes, jewelry, brief case and allowed to dress.  Her mother's pearls (circa 1948) which she had worn to court that day were "broken" and the clasp needs replacing which breaks Caranchini's heart.  The cash in her wallet (approximately $40.00) was gone.  She was escorted to the elevator where she went down to her friend TB to bring her home. Caranchini could not begin to describe what she had been going through at the jail; she just wanted "out".

---

[40]  Obtaining these documents from her lawyer Bell and dealing with addendums to this lawsuit as necessitated by the documents has caused Caranchini to suffer increasing migraines again. Caranchini was at PT when she was working on a draft of this lawsuit and she has recently been able to speak to her therapists about what she is going through.  They are astounded that she has been able to "go forward" .  However, the migraines are getting worse as she writes additional drafts of this lawsuit with more information. However, consistent with discussions with Caranchini's psychologist, Caranchini must go forward with the lawsuit to help her resolve these issues as she helped others and this lawsuit will help her help herself.

## B. POST JAIL

77. Caranchini was totally disoriented having done without six rounds of drugs and four rounds of insulin. Either that night or the next morning Caranchini went to her doctor's urgent care where she was evaluated. Her blood sugars approached 400 (135 being normal) and her blood pressure was 212 over 196. It took several days for her blood sugars and blood pressure to stabilize and normalize.

78. Caranchini started to see her physicians over her physical condition and mental condition. Such visits continue unabated with daily migraines which have increased and necessitating more drugs to control them which Caranchini has never needed in the past. They added a fourth botox shot to her schedule. Her additional drugs have changed. Her February botox shot had almost no effect whatsoever. It was her May shot before her migraines started to decrease which meant she spent six or seven hours during the day lying down with migraine pain in dark rooms. Nothing helped. Caranchini had a subsequent botox shot which has begun to reduce the pain but this never occurred before her jail "stint".

79. Caranchini used to be able to walk three to four miles a day without any problem; since the jail incident she cannot walk three or four blocks. After seeing multiple doctors to rule out multiple causes for the pain in her back and neck and spine including "electrical impulse studies", she has seen two physical therapists; the second physical therapist is a woman specializing in woman's hip pain. Caranchini traveled 40 minutes to North Kansas City and back twice a week and after eight

sessions is finally seeing some relief and is up to one mile of walking. However, the value of the sessions ceased to improve as of October 9 and they were stopped. Likewise, a followup appointment with Caranchini's "pain doctor—Dr. Gupta" on Tuesday, October 10", indicated he could do nothing further and he was referring Caranchini to a neurosurgeon for possible surgery on Caranchini's hip to relieve the pain. Caranchini has to change her diet to ensure she does not gain weight as she is Type 2 diabetic as well; all of which has caused additional problems besides the severe psychological problems occasioning seeing a psychologist as well as more frequently seeing her psychiatrist and taking a psychiatric drug she has never taken to deal with the stress. The initial drug caused a drug interaction with her migraine drugs which Caranchini often has as she is allergic to multiple drugs. This is just one example of the pain this event has caused.

80. Caranchini wrote DA Stephen Howe, **See EXHIBIT 5**, after the incarceration about what she suffered and handdelivered them to his office outlining in detail as best she could remember the horrors of her incarceration including not being permitted to make a call or bail out or get her medications and being physically assaulted by the jailers. Caranchini has never heard a thing about her complaints at all—no investigation of any kind whatsoever. She has also now written McElHinney several letters and he too has done absolutely nothing to address the Municipal Charge issues and Caranchini is disgusted by his conduct as well. These are not the lawyers that Caranchini dealt with as defense lawyers on her cases or as "compadres" in civil rights litigation in the 80's 90's and 2000's. Defense attorneys who Caranchini dealt

61

with ALWAYS replied to letters Caranchini sent in an effort to resolve issues.
Caranchini either settled or won over 90 percent of her cases because of the manner
in which she chose her cases, handled her cases and her dealings with opposing
counsel, tried her cases and mediated her cases.

### Hiring David Bell and Court Appointed Lawyer

81.    Subsequently, Caranchini hired David Bell and Wysch Hobbs & Mirakian to represent
her criminally.   Bell attempted to resolve this for almost five months without
success.  The Pecks acted as if Caranchini was the cause of her problems and would
not accept any responsibility for their actions whatsoever and expected Caranchini
to not have any contact with them at all for five years probably because RPeck could
not look Caranchini in the eye for what he had done to her after professing "undying
love to her";  and not sue them as part of any settlement which was totally
unreasonable given that they had put Caranchini in jail and she had been sexually
assaulted in jail. Caranchini has had quite enough of the intentional infliction of
emotional distress and wrongful filings by the Pecks as set forth in the multiple
videos of their meetings with the police which demonstrate their lies; even
contradicting the statements made in the hearing by RPeck. As for JOCO, Injunctive
Relief is necessary to correct the manner in which they do business but also
significant money to make them understand this is unacceptable and cannot be the
way they do business.

82. As Bell was not getting anywhere with the Pecks or McElhinney in resolving the matter, he withdrew and Caranchini entered an appearance to represent herself; Judge Phelan was rude[41] to Caranchini in the courtroom regarding her decision to represent herself questioning whether she had the background and was "competent" (his choice of word—which is insulting given Caranchini's 40 years of practice) to do so; Caranchini indicated that she had been admitted to practice law in Missouri and Kansas trial and appellate courts, Missouri and Kansas Federal Courts, the Eighth, Ninth and Tenth Circuit Courts of Appeal and the United States Supreme Court as well as courts for federal employees for their whistleblowing and EEO complaints but the Magistrate Judge still questioned whether Caranchini had the ability to represent herself. This was typical of the way he treated all women appearing before him whether defendants or attorneys.

83. The Court set the matter over for pretrial on a later date and for trial as well, however, Caranchini thereafter filed approximately ten various pretrial motions regarding the upcoming trial.

84. Caranchini then obtained from Bell the paperwork on her incarceration and learned that the ADA who had prepared the charge—Fritz-- never contacted Caranchini regarding the facts or what had occurred which was completely different than what the Pecks had said. Caranchini reviewed the tapes that Bell gave her and they

---

[41] Caranchini has appeared before dozens of Judges in state and federal courts, including the Judges who sought and obtained her disbarment, and not one of those judges was ever as rude as Judge Phelan to the undersigned or as rude to other women in Caranchini's presence in the Courtroom. He literally gave meaning to the word "msysognist" to both the undersigned and all women who appeared before him as defendants, and even as lawyers.

totally misrepresented the relationship that she and RPeck had had and totally misrepresented the facts giving rise to the charge yet the ADA Fritz totally disregarded those facts and solely relied on the facts put forth by the Pecks. Such conduct is not only grossly negligent, but amounts to a gross violation of ethics.

85. Additionally, rather than contacting Caranchini and seeing whether she would post bond on the charge to avoid incarceration, this ADA colluded with the lawyer for the Pecks to have Caranchini arrested in open Court when the TRO hearing was being had and arrested her again violating bar ethics; as the TRO hearing was based upon identical facts and if Caranchini won, which she did, there was no basis for the Municipal Charge.   One wonders whether these ADA's went to law school and took any law classes on procedure whatsoever.

86. In point of fact, Caranchini did win, but the ADA Fritz  because he was "technically ignorant" of this, because he had already arranged for Caranchini to be arrested and knew she would be thrown into jail where she would remain without the opportunity to post bond for a while knew that Caranchini probably would do anything to avoid jail in the future—including forfeiting her bond to the benefit of Johnson County—which is part of a larger scheme on the part of the DA's and Johnson County to collect money from those who end up in the jail system.

87. However, Caranchini fought the new ADA appointed to pursue the case –McElhinney because she knew she was innocent.  Settling for "diversion" is essentially an admission of "guilt" and Caranchini was not going to admit guilt when she did nothing wrong at all.

64

88. Caranchini informed ADA McElhinney repeatedly that RPeck was not complaining but LPeck was making him complain and that it was not reasonable to believe that RPeck would file a charge against Caranchini for December 24, 2016 the day he broke off the relationship with Caranchini because of the diamond earrings he had given Caranchini and because he had told Caranchini how much he loved her; yet McElhinney persisted in pursuing the claim against Caranchini and did not investigate any facts raised by Caranchini.

89. It was only after months and months involved in the case did the ADA realize on the eve of actually trying the case that he had a problem with trying the case based upon the claim it was based upon events between December 24 and 29, 2016. Only then did he seek to amend and add claims against Caranchini through January 18 and this was not based upon a complaint by the Pecks, but only upon review of the documents provided by the Pecks. After almost nine months, this "motion" was not going to get past the "giggle test" as we say in court. This may have been another reason, or THE reason that ADA McElhinney decided to drop the case against Caranchini.

90. But when Caranchini appeared at the pretrial, the Judge would not hear the motions Caranchini had filed (approximately 12) or the ADA had filed at all, and only said that Caranchini was "incompetent". When Caranchini asked what was the Court's basis, he then abandoned that contention IMMEDIATELY (interesting) and contended that Caranchini should be "in forma pauperis" because Caranchini had stated she was in foreclosure.

65

91. Caranchini by this point was sure this Judge who treated her with total distain would incarcerate her if she would not agree; she signed the paperwork and noted under her name that she did not agree but the Judge appointed counsel; the lawyer who was appointed had as her partner the ADA McElhinney's wife!  Caranchini waived the conflict but the mere appointment of such an attorney was absolutely astounding to the undersigned but consistent with the actions of this Judge and his misogynist conduct not only to the undersigned but to all the women that the undersigned witnessed him addressing in his courtroom.

92. Subsequently, after this lawyer's appointment (her name is not necessary), ADA McElhinney decided not to pursue the case at all!  He moved to dismiss the case in its entirety claiming he was "too busy"—some 10 months after it was started.   The bond was returned, the case was expunged.  And, all ADA McElhinney could say was "it was taking too much time!"   Perhaps it was because he might loose, in Caranchini's opinion.

### ACTIONS AND INACTIONS BY DISTRICT ATTORNEY STEPHEN HOWE

93. Stephen Howe, hereinafter referred to as Howe, is the elected District Attorney for Johnson County; he is responsible for the manner in which this Courthouse is run by his ADA's.  He is responsible for the way statutes are written in such a manner that bonds of large amounts are denominated for relatively insignificant charges so that they fund Johnson County's Jail and the DA,  ADA, and other attorney salaries.  If the defendant takes "diversion", he/she essentially forfeits his/her bond.  This is not

66

accidental. It is a plan and one that must be the subject to discovery and replaced with one that is "constitutional" and not based solely on collecting money while violating the rights of citizens by:

a. Keeping them in jail without notifying them of charges orally and in writing and having them formally charged at the first opportunity possible;

b. Keeping them in jail without allowing them to bail out at the earliest possible time rather than at the last possible time to use that as a leverage;

c. Refusing to provide those that are put in jail with a telephone call to contact family or a bail bondsman in a timely fashion;

d. Refusing to provide medical aid through a doctor and medications needed by people being held in the facility;

e. Refusing to provide food that people being held in the facility whether or not they are technically prisoners, can eat on their medically prescribed diet;

f. Having someone trained in the facility to not subject people with medical needs to bright lighting which can severely affect them medically;

g. To better monitor the intake people so that money is not taken and jewelry is not "broken" while in their custody;

h. Having trained sheriffs who understand they do not have unlimited authority to do whatever they want with those being held in the jail, including but not limited to harming them because they do not comply with sexual demands;

i. Having trained sheriffs trained to understand they do not have "unlimited discretion" as every sheriff advised Caranchini while she was in jail:

j.  To have every cell monitored with a camera that completely monitors the interior of the cell visually and orally;

k.  To have cameras that monitor the entire area outside the cells in which the Sheriffs and deputies congregate and work both visually and orally;

l.  To periodically train these staff as to what they can and cannot do as their conduct violates the rights of persons incarcerated who have not been charged as well as charged.

## DAMAGES SUFFERED BY CARANCHINI

94.  Caranchini who has represented individuals since 1982 in discrimination and employment cases and resolved the issues in their lives, believes she cannot get "past" this horrible experience unless she pursues this litigation; her psychologist particularly believes that Caranchini must file this lawsuit to help herself get past these events just as she files lawsuits to help her clients get past events in their jobs. Those discussions brought Caranchini to the decision to file this lawsuit to help her get some resolution of this "chapter" of her life.   Prior to 1982 Caranchini did defense work, including work on the Hyatt Regency Collapse case for a structural engineer and a major defense firm.

95.  Caranchini has reviewed the tapes of the statements of the Pecks to the Police Officers regarding their claims which are part of the discovery in the criminal matter. Caranchini categorically denies the claims and statements being made by both the Pecks against Caranchini or their "version" of the facts on those tapes.   However,

those tapes were very disturbing as they were categorically opposite everything that

RPeck has said to Caranchini over nine years of their relationship of his love and

caring for her and his desire to be with her; any time Caranchini referred work to

him he was grateful and it was not looked upon by him as something he expected

and that was very clear to Caranchini; this was clearly something he told LPeck in

Caranchini's opinion.

96.    Caranchini attempts to walk daily (although her walking has been severely limited by

the hip problems caused by lying on the jail house floor). Apparently she now needs

surgery to correct the problems she has developed. She works with her church

pantry and in several church projects to "de-stress" and has increased to 20 or

more hours a week her time but still remains distressed daily and cannot dismiss the

horrid statements of RPeck and LPeck in videos of his statements to the police or the

actions he has taken despite claiming on December 24 that Caranchini "did not know

how much he loved her"; Caranchini has also been subjected to two nasty (that is an

understatement) letters allegedly sent by RPeck but in reality written and sent by

LPeck who even forged RPeck's signature to the documents taking information he

conveyed to Caranchini and "turning it upside down" to mean something totally

different. The letters which are four or five pages can only be described as "bizarre".

97.    Caranchini continues to suffer physically and mentally daily as set forth in these

facts. She is seeing multiple doctors more frequently as set forth herein and taking

more medication as also set forth herein and to which she will testify. It has not

been pleasant since December and will not be for a long time to come and

69

Caranchini did nothing. As RPeck always said: "its not you, its me". That is more true than ever. But now it has impacted Caranchini's relationships with her sister and daughter; her work relationships, and her friendships. The end is "not in sight" unfortunately but hopefully the filing of this lawsuit will help move this matter forward for Caranchini and her relationships.